UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WEST VIRGINIA INVESTMENT MANAGEMENT BOARD, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MORGAN STANLEY CAPITAL I INC., MORGAN STANLEY MORTGAGE CAPITAL INC., MORGAN STANLEY, MORTGAGE LOAN TRUST 2006-5AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-4SL, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-6AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-7, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-8AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-10SL, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-9AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-11, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-13ARX, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-12XS, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-14SL, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-15XS, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-16AX, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-17XS, | Civil Action No. 09 CIV 4414<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

[Caption continued on following page.]

MORGAN STANLEY MORTGAGE LOAN TRUST 2007-2AX, MORGAN STANLEY MORTGAGE LOAN TRUST 2007-1XS, MORGAN STANLEY MORTGAGE LOAN TRUST 2007-3XS, MORGAN STANLEY MORTGAGE LOAN TRUST 2007-5AX, MORGAN STANLEY MORTGAGE LOAN TRUST 2007-4SL, MORGAN STANLEY MORTGAGE LOAN TRUST 2007-6XS, MORGAN STANLEY MORTGAGE LOAN TRUST 2007-7AX, MORGAN STANLEY MORTGAGE LOAN TRUST 2007-8XS, MORGAN STANLEY MORTGAGE LOAN TRUST 2007-9SL, MORGAN STANLEY MORTGAGE LOAN TRUST 2007-11AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2007-10XS, MORGAN STANLEY MORTGAGE LOAN TRUST 2007-12, MORGAN STANLEY MORTGAGE LOAN TRUST 2007-13, MORGAN STANLEY MORTGAGE LOAN TRUST 2007-14AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2007-15AR, MORGAN STANLEY & CO. INCORPORATED, MOODY'S INVESTORS SERVICE, INC., STANDARD & POOR'S RATINGS SERVICES, THE MCGRAW-HILL COMPANIES, INC., FITCH, INC., DAVID R. WARREN, WILLIAM J. FORSELL, ANTHONY B. TUFARIELLO, VALERIE H. KAY and STEVEN S. STERN,

Defendants.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons or entities who acquired the Mortgage Pass-Through Certificates ("Certificates") of Morgan Stanley Capital I Inc. ("Morgan Stanley Capital" or the "Depositor"), pursuant and/or traceable to the false and misleading Registration Statement and Prospectus Supplements issued between December 2005 and November 2007 by Morgan Stanley Capital (collectively, the "Registration Statement"). This action, brought against the issuers and underwriters of the Certificates, involves solely ***strict liability*** and ***negligence*** claims brought pursuant to the Securities Act of 1933 ("1933 Act").

2. Morgan Stanley Capital was formed on January 28, 1985. Morgan Stanley Capital is engaged in the securitization of loans and the business of acting as depositor of trusts that issue series of certificates that represent interests in the assets of the trust. Morgan Stanley Capital acquires assets specifically for inclusion in a securitization from the sellers in privately negotiated transactions. Morgan Stanley Capital is an affiliate of Morgan Stanley Mortgage Capital Inc. ("MSMC"), which is also the parent of Morgan Stanley Capital and an affiliate, through common parent ownership, of Morgan Stanley Capital Services Inc. and of Morgan Stanley & Co. Incorporated ("MS&Co"), and is a direct, wholly-owned subsidiary of MSMC. MSMC is an indirect wholly owned subsidiary of Morgan Stanley. MSMC acquires residential mortgage loans through bulk purchases and also through purchases of single loans through MSMC's conduit loan purchase program. The mortgage loans purchased through its conduit program generally conform to the conduit origination standards.

3. The issuers of the various offerings (the "Defendant Issuers") are the Trusts identified in ¶15 established by defendants to issue billions of dollars worth of Certificates in 2005-2007.

4. On December 23, 2005 (with amendments on February 17, 2006 and March 14, 2006), Morgan Stanley Capital and the Defendant Issuers caused the Registration Statement to be

filed with the Securities and Exchange Commission ("SEC") in connection with the issuance of billions of dollars of Certificates. The Certificates were issued pursuant to Prospectus Supplements, each of which was incorporated into the Registration Statement. The Certificates included several classes or tranches, which had various priorities of payment, exposure to default, interest payment provisions and/or levels of seniority.

5. The Certificates were supported by large pools of mortgage loans. The Registration Statement represented that the mortgage pools would primarily consist of loan groups generally secured by first liens on residential properties, including conventional, adjustable rate and negative amortization mortgage loans.

6. Investors purchased the Certificates based upon two primary factors: return (in the form of interest payments), including timing of principal and interest payments, and safety (risk of default of the underlying mortgage loan assets). The Registration Statement discussed the underwriting standards purportedly used in connection with the underwriting of the underlying mortgage loans and included numerous representations about the loan-to-value ratios used to qualify borrowers, the appraisals of properties underlying the mortgages and the maximum debt-to-income ratios permitted on the mortgage loans.[1]

7. This action also charges credit rating agencies Moody's Investors Service, Inc. ("Moody's"), The McGraw-Hill Companies, Inc. ("McGraw-Hill") and its affiliates, including its wholly-owned and controlled business division Standard & Poor's Ratings Services ("S&P") and Fitch, Inc. ("Fitch") and its subsidiaries (collectively referred to as the "Rating Agencies"), with violations of the federal securities laws.

---

[1] Loan-to-value or "LTV" ratio is the ratio of the money borrowed to the market value of the property.

8. The Registration Statement omitted and/or misrepresented the fact that the sellers of the underlying mortgages to Morgan Stanley Capital were issuing many of the mortgage loans to borrowers who: (i) did not meet the prudent or maximum debt-to-income ratio purportedly required by the lender; (ii) did not provide adequate documentation to support the income and assets required for the lenders to approve and fund the mortgage loans pursuant to the lenders' own guidelines; (iii) were steered to stated income/asset and low documentation mortgage loans by lenders, lenders' correspondents or lenders' agents, such as mortgage brokers, because the borrowers could not qualify for mortgage loans that required full documentation; and (iv) did not have the income required by the lenders' own guidelines to afford the required mortgage payments which resulted in a mismatch between the amount loaned to the borrower and the capacity of the borrower. The Registration Statement failed to disclose that the lenders or the lenders' agents knew that the borrowers either could not provide the required documentation or refused to provide it. In addition, the Registration Statement did not disclose that:

- The underwriting, quality control and due diligence practices utilized in connection with the approval and funding of the mortgage loans were so weak that some borrowers were given mortgage loans based on stated income in the loan applications with purported income amounts that could not possibly be reconciled with the jobs claimed on the loan application or through a check of free "online" salary databases such as salary.com.

- The appraisals of many properties were inflated, as appraisers were pressured by lenders, lenders' correspondents or the lenders' agents, such as mortgage brokers, to provide the desired appraisal value regardless of the actual value of the underlying property so the mortgage loan would be approved and funded. In this way many appraisers were rewarded for their willingness to support preconceived or predetermined property values violating the Uniform Standards of Professional Appraisal Practice ("USPAP").[2]

---

[2] USPAP are the generally accepted standards for professional appraisal practice in North America. USPAP contain standards for all types of appraisal services. Standards are included for real estate, personal property, business and mass appraisal.

9. As a result of the misstatements and omissions detailed herein, the Certificates sold to plaintiff and the Class were secured by assets that had a much greater risk profile in the form of a statistically significant difference between the expected versus actual performance of such assets than represented in the Registration Statement, and defendants offered superior credit ratings on the Certificates as a result of defendants' failure to disclose the underwriting defects and appraisal manipulations.[3]

10. By the summer of 2007, the amount of uncollectible mortgage loans securing the Certificates began to be revealed to the public. To avoid scrutiny for their own involvement in the sale of the Certificates, the Rating Agencies began to put negative watch labels on many Certificate classes, ultimately downgrading many. The delinquency and foreclosure rates of the mortgage loans securing the Certificates has grown both faster and in greater quantity than what would be expected for mortgage loans of the types described in the Prospectus Supplements. As an additional result, the Certificates are no longer marketable at prices anywhere near the price paid by plaintiff and the Class and the holders of the Certificates are exposed to much more risk with respect to both the timing and absolute cash flow to be received than the Registration Statement/Prospectus Supplements represented.

## JURISDICTION AND VENUE

11. The claims alleged herein arise under §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o. Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act.

---

[3] The Rating Agencies are approved as "Nationally Recognized Statistical Rating Organizations" (or "NRSROs") by the SEC and are intended to provide independent, easy-to-use measurements of relative credit risk.

12. The violations of law complained of herein occurred in this District, including the dissemination of materially false and misleading statements complained of herein into this District. Morgan Stanley Capital and MS&Co conduct business in this District.

## PARTIES

13. Plaintiff West Virginia Investment Management Board acquired Certificates pursuant and traceable to the Registration Statement and Prospectus Supplements and has been damaged thereby.

14. Defendant Morgan Stanley Capital is a Delaware corporation headquartered in New York, New York. It is a special purpose corporation formed on January 28, 1985.

15. Each of the Defendant Issuers of the Certificates is a Delaware trust which issued billions of dollars worth of Certificates pursuant the Registration Statement. The Defendant Issuers are:

| | |
|---|---|
| Morgan Stanley Mortgage Loan Trust 2006-5AR | Morgan Stanley Mortgage Loan Trust 2007-2AX |
| Morgan Stanley Mortgage Loan Trust 2006-4SL | Morgan Stanley Mortgage Loan Trust 2007-1XS |
| Morgan Stanley Mortgage Loan Trust 2006-6AR | Morgan Stanley Mortgage Loan Trust 2007-3XS |
| Morgan Stanley Mortgage Loan Trust 2006-7 | Morgan Stanley Mortgage Loan Trust 2007-5AX |
| Morgan Stanley Mortgage Loan Trust 2006-8AR | Morgan Stanley Mortgage Loan Trust 2007-4SL |
| Morgan Stanley Mortgage Loan Trust 2006-10SL | Morgan Stanley Mortgage Loan Trust 2007-6XS |
| Morgan Stanley Mortgage Loan Trust 2006-9AR | Morgan Stanley Mortgage Loan Trust 2007-7AX |
| Morgan Stanley Mortgage Loan Trust 2006-11 | Morgan Stanley Mortgage Loan Trust 2007-8XS |
| Morgan Stanley Mortgage Loan Trust 2006-13ARX | Morgan Stanley Mortgage Loan Trust 2007-9SL |
| Morgan Stanley Mortgage Loan Trust 2006-12XS | Morgan Stanley Mortgage Loan Trust 2007-11AR |
| Morgan Stanley Mortgage Loan Trust 2006-14SL | Morgan Stanley Mortgage Loan Trust 2007-10XS |

Morgan Stanley Mortgage Loan Trust 2006-15XS
Morgan Stanley Mortgage Loan Trust 2006-16AX
Morgan Stanley Mortgage Loan Trust 2006-17XS
Morgan Stanley Mortgage Loan Trust 2007-12
Morgan Stanley Mortgage Loan Trust 2007-13
Morgan Stanley Mortgage Loan Trust 2007-14AR
Morgan Stanley Mortgage Loan Trust 2007-15AR

16. Defendant MSMC provides warehouse and repurchase financing to mortgage lenders and purchases closed, first- and subordinate-lien residential mortgage loans for securitization or resale, or for its own investment. MSMC also acquires residential mortgage loans through bulk purchases and also through purchases of single loans through MSMC's conduit loan purchase program. The mortgage loans purchased through its conduit program generally conform to the conduit origination standards. MSMC is an indirect wholly-owned subsidiary of Morgan Stanley, the parent of the Depositor and is affiliated with one of the underwriters, MS&Co. MSMC was formed in 1984 and is a New York corporation based in New York, New York.

17. Defendant MS&Co is an affiliate of the Depositor and of MSMC. MS&Co acted as sole lead manager and sole bookrunner with respect to the Certificates. Additionally, MS&Co acted as underwriter in the sale of the Certificates and in doing so drafted and disseminated the offering documents. MS&Co failed to perform adequate due diligence to ensure the statements incorporated into the Registration Statement were not misleading.

18. Defendant Moody's is a credit rating agency based in the United States.

19. Defendant McGraw-Hill is a leading global information services provider meeting worldwide needs in the financial services, education and business information market.

20. Defendant S&P is a credit rating agency based in the United States. Defendant S&P is a subsidiary of defendant McGraw-Hill.

21. Defendant Fitch is a credit rating agency based in the United States and London.

22. The Rating Agencies rated the following trusts:

| Trust | Prospectus Supplement Date | Rating Agencies |
|---|---|---|
| Morgan Stanley Mortgage Loan Trust 2006-5AR | 3/27/2006 | S&P, Moody's, Fitch |
| Morgan Stanley Mortgage Loan Trust 2006-4SL | 3/27/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-6AR | 4/26/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-7 | 5/25/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-8AR | 5/25/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-10SL | 7/20/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-9AR | 7/26/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-11 | 7/26/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-13ARX | 9/26/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-12XS | 9/26/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-14SL | 10/24/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-15XS | 10/25/2006, 1/5/07 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-16AX | 10/26/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-17XS | 12/21/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-2AX | 1/24/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan | 1/25/2007 | S&P, Moody's |

| TRUST | PROSPECTUS SUPPLEMENT DATE | RATING AGENCIES |
|---|---|---|
| Trust 2007-1XS | | |
| Morgan Stanley Mortgage Loan Trust 2007-3XS | 2/26/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-5AX | 2/26/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-4SL | 2/27/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-6XS | 3/27/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-7AX | 4/26/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-8XS | 5/29/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-9SL | 6/27/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-11AR | 6/26/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-10XS | 6/27/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-12 | 7/27/2007 | S&P, Fitch |
| Morgan Stanley Mortgage Loan Trust 2007-13 | 9/26/2007 | S&P, Fitch |
| Morgan Stanley Mortgage Loan Trust 2007-14AR | 10/29/2007 | S&P, Fitch, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-15AR | 11/29/2007 | Fitch, S&P |

23. Among other things, Moody's, S&P, McGraw Hill and Fitch were involved in the structuring, rating and monitoring of the Certificates. The Rating Agencies received a substantial fee for helping Morgan Stanley Capital sell the Certificates. The Rating Agencies' substantial remuneration was drawn from the proceeds of the Certificates issuance, and their ongoing fees were

paid out of income owed to Certificate investors. It was a condition to each offering that the Certificates receive certain ratings from the Rating Agencies.

24. Defendant David R. Warren ("Warren") was President of Morgan Stanley Capital during the relevant time period. Defendant Warren signed the December 23, 2005 Registration Statement.

25. Defendant Anthony B. Tufariello ("Tufariello") was President (Principal Executive Officer) of Morgan Stanley Capital during the relevant time period. Defendant Tufariello signed the December 23, 2005, February 17, 2006 and March 14, 2006 Registration Statements.

26. Defendant William J. Forsell ("Forsell") was Treasurer (Principal Financial Officer) and Controller of Morgan Stanley Capital during the relevant time period. Defendant Forsell signed the December 23, 2005, February 17, 2006 and March 14, 2006 Registration Statements.

27. Defendant Valerie H. Kay ("Kay") was a director of Morgan Stanley Capital during the relevant time period and at the time the December 23, 2005, February 17, 2006 and March 14, 2006 Registration Statements were filed with the SEC.

28. Defendant Steven S. Stern ("Stern") was a director of Morgan Stanley Capital during the relevant time period. Defendant Stern signed the December 23, 2005, February 17, 2006 and March 14, 2006 Registration Statements.

29. The defendants identified in ¶¶24-28 are referred to herein as the "Individual Defendants." The Individual Defendants functioned as directors to the Trusts as they were directors to Morgan Stanley Capital and signed the Registration Statement for the registration of the securities issued by the Trusts.

30. These defendants aided and abetted, and/or participated with and/or conspired with, the named defendants in the wrongful acts and course of conduct or otherwise caused the damages

and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

31. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired Certificates of the Trusts identified herein pursuant and/or traceable to the false and misleading Registration Statement (Registration No. 333-130684) (the "Class"). Excluded from the Class are defendants, the officers and directors and affiliates of the defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

32. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Morgan Stanley Capital and/or MSMC or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. The Registration Statement issued billions of dollars worth of Certificates.

33. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

34. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

35. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether defendants violated the 1933 Act;

(b) whether statements made by defendants to the investing public in the Registration Statement misrepresented material facts about the Certificates and/or the underlying mortgage loans held by the Trusts; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

36. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**BACKGROUND**

37. Morgan Stanley Capital is an affiliate of MSMC, which is also the parent of Morgan Stanley Capital, and an affiliate, through common parent ownership, of Morgan Stanley Capital Services Inc. and of MS&Co, and is a direct, wholly-owned subsidiary of MSMC. Morgan Stanley Capital is engaged in the securitization of loans and in the business of acting as depositor of trusts that issue series of certificates that represent interests in the assets of the trust. Morgan Stanley Capital acquires assets specifically for inclusion in a securitization from the sellers in privately negotiated transactions. Morgan Stanley Capital was set up to establish the Trusts, acquire mortgage loans and then issue Certificates of various classes or tranches that were sold to investors pursuant to the Registration Statement. The Registration Statement contained data about the characteristics of

the mortgage loans. However, the defendants omitted and/or misrepresented material information in the Registration Statement about the origination, underwriting, quality control, approval and funding practices and policies for the mortgage loans, as well as the likelihood borrowers would repay such mortgage loans according to the terms of the mortgage and/or deed of trust. This depended on several factors, including creditworthiness of the borrowers, debt-to-income levels, loan-to-value ratios, assets of the borrowers, occupancy of the properties securing the mortgage loans, and the accuracy of other data collected during the origination of the mortgage loans. Material omissions and misrepresentations related to these factors rendered the mortgage loans defective qualified loans prior to their transfer to Morgan Stanley Capital.

## THE FALSE AND MISLEADING REGISTRATION STATEMENT/PROSPECTUS SUPPLEMENTS

38. Morgan Stanley Capital issued a Registration Statement, filed with the SEC on or about December 23, 2005, and amended on February 17, 2006 and March 14, 2006, which discussed the mortgage loans contained in the mortgage pools held by the Defendant Issuers. Defendants represented that the mortgage loans held by the Defendant Issuers were mortgage loans made to creditworthy borrowers whose income documentation was subject to established standards just a notch below those established for other borrowers.

39. Emphasizing the underwriting standards and income verification requirements utilized to generate the underlying mortgage loans held by the Defendant Issuers, the March 14, 2006 amendment to the Registration Statement stated:

> Generally, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the mortgagor's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also have been required to authorize

> verifications of deposits at financial institutions where the mortgagor had demand or savings accounts. In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for loan purchasing purposes, in addition to the income of the mortgagor from other sources.
>
> * * *
>
> The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to FNMA and/or FHLMC. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

40. These representations were false and misleading. The true facts which were concealed were that the originators and other lenders that sold mortgage loans to Morgan Stanley Capital had become so aggressive in approving and funding loans that many of the mortgage loans were made to borrowers who had either falsified the required documentation or had not submitted it to the lender. Similarly, for those self-employed borrowers who were actually required to document income levels, income levels were routinely inflated to extreme levels in order to ensure approval of the mortgage loans.

41. With respect to appraisals, the true facts were that the appraisals were unreliable due to lack of controls on the part of MSMC and the lenders. Moreover, the originators had exerted pressure on appraisers to produce pre-determined appraisal values that were not based upon the actual values of the properties. Appraisers employed by the originators were also secretly pressured

to appraise properties at a certain level or they would not be hired again, resulting in appraisals being done on a "drive-by" basis, where appraisers issued appraisals without a reasonable basis.

## FALSE STATEMENTS ABOUT ORIGINATORS' PRACTICES

**American Home Mortgage Corp.**

42. The Prospectus Supplements made false statements about the underwriting practices of American Home Mortgage Corp. ("AHM"), which was a key originator for the following Trusts:

| | |
|---|---|
| Morgan Stanley Mortgage Loan Trust 2006-5AR | Morgan Stanley Mortgage Loan Trust 2006-16AX |
| Morgan Stanley Mortgage Loan Trust 2006-4SL | Morgan Stanley Mortgage Loan Trust 2006-17XS |
| Morgan Stanley Mortgage Loan Trust 2006-6AR | Morgan Stanley Mortgage Loan Trust 2007-14AR |
| Morgan Stanley Mortgage Loan Trust 2006-15XS | Morgan Stanley Mortgage Loan Trust 2007-15AR |

43. For example, the Prospectus Supplement for Morgan Stanley Mortgage Loan Trust 2006-5AR, dated March 27, 2006, stated:

> (a) American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations. Exceptions to the underwriting standards may be permitted where compensating factors are present. In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources. With respect to second homes and vacation properties, no income derived from the property will have been considered for underwriting purposes. Because each loan is different, American Home expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.

***Omitted Information***: AHM was granting exceptions even where "compensating factors" did not exist in order to get loan volume up. AHM's business was dependent on continually increasing volume. Thus, AHM became even more aggressive in early 2007 when it made $16.7 billion in mortgage loans. A third of its mortgages were pay-option adjustable rate mortgages ("ARMs")

which allowed borrowers to make less than the interest payment on the loan by adding deferred payments to the principal balance. AHM was extremely aggressive in granting exceptions because its business relied on volume. In fact, AHM went bankrupt and closed in August 2007, after loan volumes dropped.

> (b) American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

***Omitted Information***: AHM's loans were particularly popular with speculators who would not occupy the homes, which would decrease the borrowers' "willingness" to pay the debt if home prices stagnated or dropped. AHM subsequently suffered losses itself when "borrowers whose income [AHM] hadn't verified began to default on little-money-down loans at an accelerated pace." *Smartmoney.com*, July 30, 2007.

> (c) Non-conforming loans are generally documented to the requirements of Fannie Mae and Freddie Mac, in that the borrower provides the same information on the loan application along with documentation to verify the accuracy of the information on the application such as income, assets, other liabilities, etc. Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require. Certain non-conforming ALT-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require. For these ALT-A products, the borrower may not be required to verify employment income, assets required to close or both. For some other ALT-A products, the borrower is not required to provide any information regarding employment income, assets required to close or both. ALT-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

***Omitted Information***: The strategy of granting loans under stated income applications relied significantly on accurate appraisals which AHM did not obtain. While AHM did much of its business in areas where prices were rapidly appreciating, it also did business in states with lower appreciation and in 2005-2006 had suffered itself from faulty appraisals in both Texas and Illinois when loans defaulted and appraisals were shown to be inflated. The frequency of problematic appraisals in these states did not bode well for appraisals in states such as California and Florida.

Moreover, the credit scores upon which the strategy relied could also be manipulated by borrowers either becoming an approved user on a person's card who had better credit or by complaining without basis to the credit score companies.

> (d) In order to determine if a borrower qualifies for a non-conforming loan, the loans have been either approved by Fannie Mae's Desktop Underwriter, Freddie Mac's Loan Prospector automated underwriting systems, a customized form of Fannie Mae's Desktop Underwriter called Custom Desktop Underwriter, or they have been manually underwritten by American Home's underwriters. American Home's ALT-A loan products generally have been approved manually by contract underwriters provided by certain mortgage insurance companies or by American Home's senior underwriters. American Home Solutions products must receive an approval from the Assetwise automated underwriting system. For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis. Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

***Omitted Information***: AHM was not nearly as meticulous with evaluating borrowers as this statement implies. Borrowers were helped to get loans despite these problems due to AHM's efforts in 2006-2007 to keep loan volume up despite a slowdown in activity. Borrowers have in fact complained that loans were switched on them by AHM, leaving them with mortgages they could not pay.

> (e) Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by American Home's vendor

> management company or an underwriter of American Home or a mortgage insurance company contract underwriter.
>
> The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property, this ratio is based on the lower of the sales price of the property and the appraised value. American Home sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan. In general, American Home requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction, loans on second homes or loans on investment properties. A lower loan-to-value ratio requires a borrower to have more equity in the property, which is a significant additional incentive to the borrower to avoid default on the loan. In addition, for all loans in which the loan-to-value ratio exceeds 80%, American Home requires that the loan be insured by a private mortgage insurance company that is approved by Fannie Mae and Freddie Mac. Loans with higher loan-to-value ratios require higher coverage levels. For example, non-conforming loans with loan-to-value ratios of 85%, 90% and 95% require mortgage insurance coverage of 12%, 25% and 30%, respectively. ALT-A loans with full or alternative documentation and loan-to-value ratios of 85%, 90%, 95% and 97% require mortgage insurance coverage of 12-20%, 25%, 30% and 35%, respectively. ALT-A loans with loan-to-value ratios up to 100% require 35% coverage.

***Omitted Information***: AHM's loan-to-value ratios assumed valid appraisals were performed. This was not the case as appraisers felt pressured to appraise to certain values. Inflated appraisals were common.

> (f) American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

***Omitted Information***: AHM was using anything but "common sense" in granting mortgages to customers with little money down where a third of the mortgages were pay-option ARMs and many of the loans were to speculators.

**GreenPoint Mortgage Funding, Inc.**

44. The Prospectus Supplements included false statements about the loan underwriting practices of GreenPoint Mortgage Funding, Inc. ("GreenPoint") which was a key originator for the following Trusts:

| | |
|---|---|
| Morgan Stanley Mortgage Loan Trust 2006-7 | Morgan Stanley Mortgage Loan Trust 2007-2AX |
| Morgan Stanley Mortgage Loan Trust 2006-12XS | Morgan Stanley Mortgage Loan Trust 2007-13 |
| Morgan Stanley Mortgage Loan Trust 2006-15XS | Morgan Stanley Mortgage Loan Trust 2007-12 |
| Morgan Stanley Mortgage Loan Trust 2006-17XS | |

45. For example, the Prospectus Supplement for Morgan Stanley Mortgage Loan Trust 2006-7, dated May 25, 2006, stated:

> (a) Underwriting Standards. Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Exceptions to the guidelines are permitted where compensating factors are present.

***Omitted Information***: Exceptions to guidelines were granted in many circumstances – not just where compensating factors existed. The exceptions were granted when the borrower could not qualify. Many of the loans were granted by the over 18,000 brokers that were approved to transact with GreenPoint – a large enough number that GreenPoint could not exercise any degree of realistic control. Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved.

> (b) GreenPoint acquires or originates many mortgage loans under "limited documentation" or "no documentation" programs. Under limited documentation programs, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower, than on verified income of the borrower. Mortgage loans underwritten under this type of program are generally limited to borrowers with credit histories that demonstrate an

> established ability to repay indebtedness in a timely fashion, and certain credit underwriting documentation concerning income or income verification and/or employment verification is waived.

***Omitted Information***: These deficiencies in income documentation made accurate and reliable appraisals essential since so much emphasis was placed on the value of the mortgaged property. However, appraisers were in fact pressured to appraise to certain levels. Appraisers knew if they appraised under certain levels they would not be hired again.

> (c) In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers the ratio of those amounts to the proposed borrower's monthly gross income. These ratios vary depending on a number of underwriting criteria, including loan-to-value ratios ("LTV"), and are determined on a loan-by-loan basis. The ratios generally are limited to 40% but may be extended to 50% with adequate compensating factors, such as disposable income, reserves, higher FICO credit score, or lower LTV's. Each mortgage loan has a required amount of reserves, with the minimum being three months of principal, interest, taxes and insurance for full documentation loans. Depending on the LTV and occupancy types, these reserve requirements may be increased to compensate for the additional risk.

***Omitted Information***: The documents failed to describe GreenPoint's practice of allowing its staff or outside brokers to push appraisal values which distorted the loan-to-value ratios referred to in the Prospectus Supplement.

> (d) Mortgage loans originated and acquired with limited documentation programs include cash-out refinance loans, super-jumbo mortgage loans and mortgage loans secured by investor-owned properties. Permitted maximum loan-to-value ratios (including secondary financing) under limited documentation programs are generally more restrictive than mortgage loans originated with full documentation requirements. Under no documentation programs, income ratios for the prospective borrower are not calculated. Emphasis is placed on the value and adequacy of the mortgaged property as collateral and the credit history of the prospective borrower, rather than on verified income and assets of the borrower. Documentation concerning income, employment verification and asset verification is not required and income ratios are not calculated. Mortgage loans underwritten under no documentation programs are generally limited to borrowers with favorable credit histories and who satisfy other standards for limited documentation programs.

***Omitted Information***: GreenPoint did not verify the income of borrowers as represented but had a reputation in the industry for cutting corners on underwriting. As a result of GreenPoint's poor underwriting practices, GreenPoint's parent, Capital One, recently took an $860 million charge

**Morgan Stanley Credit Corporation**

46. The Prospectus Supplements included false statements about the loan underwriting practices of Morgan Stanley Credit Corporation ("MSCC") which was a key originator for the following Trusts:

| | |
|---|---|
| Morgan Stanley Mortgage Loan Trust 2006-8AR | Morgan Stanley Mortgage Loan Trust 2007-12 |
| Morgan Stanley Mortgage Loan Trust 2006-11 | Morgan Stanley Mortgage Loan Trust 2007-13 |
| Morgan Stanley Mortgage Loan Trust 2006-6AR | Morgan Stanley Mortgage Loan Trust 2007-14AR |
| Morgan Stanley Mortgage Loan Trust 2006-7 | Morgan Stanley Mortgage Loan Trust 2007-15AR |

47. The Prospectus Supplement issued in connection with the Morgan Stanley Mortgage Loan Trust 2006-8AR, dated May 25, 2006, made false statements about the underwriting standards of MSCC, noting:

> (a) Origination. MSCC's origination guidelines for Mortgage Loans use a combination of automated and judgmental underwriting criteria to evaluate credit risk, and this risk assessment may affect documentation requirements. MSCC's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral. A prospective borrower applying for a mortgage loan is required to submit an application in writing or via telephone, which elicits pertinent information about the prospective borrower including, the prospective borrower's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired. MSCC employs underwriters to scrutinize the prospective borrower's credit profile. If required by the underwriting guidelines, employment verification is obtained either from the prospective borrower's employer or through analysis of copies of borrower's federal withholding (IRS W-2) forms and/or current payroll earnings statements. With respect to every prospective borrower, a credit report summarizing the prospective

> borrower's credit history is obtained. In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources, if applicable.

***Omitted Information***: MSCC did not in fact enforce its underwriting guidelines to ensure borrowers' repayment ability but accepted just about any loan application. The brokers not only generated suspect loans but also gave misleading information to borrowers, such that borrowers were unaware that some of the fees charged included outlandish yield spread premiums and prepayment penalties. The typical borrower was either subprime or Alt-A with a "liar" loan, where the income levels were inflated. This contributed to the bad loans.

> (b) The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

***Omitted Information***: In fact, the appraisals obtained by MSCC were intentionally inflated to achieve the desired loan-to-value ratios.

**First National Bank of Nevada**

48. The Registration Statement and Prospectus Supplements contained false statements about the loans originated by First National Bank of Nevada ("FNBN") which was the key originator in the following Trusts:

| | |
|---|---|
| Morgan Stanley Mortgage Loan Trust 2006-9AR | Morgan Stanley Mortgage Loan Trust 2007-3XS |
| Morgan Stanley Mortgage Loan Trust 2006-12XS | Morgan Stanley Mortgage Loan Trust 2007-6XS |
| Morgan Stanley Mortgage Loan Trust 2007-1XS | Morgan Stanley Mortgage Loan Trust 2007-11AR |

49. The Prospectus Supplement issued in connection with Morgan Stanley Mortgage Loan Trust 2006-9AR, dated July 26, 2006, made false statements about the underwriting standards of FNBN, noting:

> Generally, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the mortgagor's credit history with local merchants and lenders and any record of bankruptcy. . . . In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for loan purchasing purposes, in addition to the income of the mortgagor from other sources.
>
> With respect to mortgaged property consisting of vacation or second homes, no income derived from the property will have been considered for loan purchasing purposes.
>
> * * *
>
> In addition, on a case-by-case basis, the Seller may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under its loan purchasing guidelines warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratios, low debt-to-income ratios, good credit history, stable employment, financial reserves, and time in residence at the applicant's current address.

***Omitted Information***: The lender, FNBN, was not limiting the granting of mortgages outside of its guidelines to situations involving borrowers with compensating factors, but was going outside the guidelines where sufficient compensating factors did not exist in an effort to reach targets on loan originations. FNBN was, in fact, misrepresenting home values, income, net worth and employment status of borrowers.

**Lydian Private Bank**

50. The Registration Statement and Prospectus Supplements contained false statements about the loans originated by Lydian Private Bank ("Lydian"), which was the key originator in the following Trusts:

| | |
|---|---|
| Morgan Stanley Mortgage Loan Trust 2007-1XS | Morgan Stanley Mortgage Loan Trust 2007-3XS |

51. For example, the Prospectus Supplement for Morgan Stanley Mortgage Loan Trust 2007-3XS, dated February 26, 2007, stated:

> Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective mortgagor's gross income. The percentage applied varies on a case by case basis depending on a number of loan purchasing criteria, including the Loan-to-Value Ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the mortgagor after origination.
>
> Certain of the mortgage loans have been originated under alternative, reduced documentation, no-stated-income, no-documentation, no-ratio or stated income/stated assets programs, which require less documentation and verification than do traditional full documentation programs. Generally, under an alternative documentation program, the borrower provides alternate forms of documentation to verify employment, income and assets. Under a reduced documentation program, no verification of one of either a mortgagor's income or a mortgagor's assets is undertaken by the originator. Under a no-stated-income program or a no-ratio program, certain borrowers with acceptable payment histories will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken. Under a stated income/stated assets program, no verification of both a mortgagor's income and a mortgagor's assets is undertaken by the originator. Under a no-documentation program, no verification of a mortgagor's income or assets is undertaken by the originator and such information may not even be stated by the mortgagor. The loan purchasing decisions for such mortgage loans may be based primarily or entirely on an appraisal of the mortgaged property and the Loan-to-Value Ratio at origination.

***Omitted Information***: In fact, Lydian's lending practices were much riskier than described above. Lydian emphasized pay-option ARMs, which permitted borrowers to pay a lower amount each month, leading to an increasing loan balance. Given the geographical locations of these programs (Florida and California), the risk of inflated appraisals made these programs highly likely to result in defaults.

**FALSE STATEMENTS ABOUT UNDERWRITING OF THE LOANS GENERALLY**

52. The Registration Statement and Prospectus Supplements also misrepresented the general origination practices of the sellers and originators.

53. The Morgan Stanley Mortgage Loan Trust 2007-10XS Prospectus Supplement filed by defendants with the SEC on June 27, 2007, stated:

> Under a stated income/stated assets program, no verification of both a mortgagor's income and a mortgagor's assets is undertaken by the originator. Under a no-documentation program, no verification of a mortgagor's income or assets is undertaken by the originator and such information may not even be stated by the mortgagor. The loan purchasing decisions for such mortgage loans may be based primarily or entirely on an appraisal of the mortgaged property and the Loan-to-Value Ratio at origination.
>
> The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

54. The statement detailed above was false and misleading as the appraisal manipulations occurring at the origination stage, whereby appraisals were inflated or issued with only minimal effort, caused the loan-to-value ratio to be understated, meaning the stated income/stated asset program was riskier than represented.

55. In the Morgan Stanley Mortgage Loan Trust 2006-10SL Prospectus Supplement, dated July 20 2006, defendants detailed "General Underwriting Guidelines," stating:

> Certain of the mortgage loans have been originated under alternative, reduced documentation, no-stated-income, no-documentation, no-ratio or stated income/stated assets programs, which require less documentation and verification than do traditional full documentation programs. Generally, under an alternative documentation program, the borrower provides alternate forms of documentation to verify employment, income and assets. Under a reduced documentation program, no verification of one of either a mortgagor's income or a mortgagor's assets is undertaken by the originator. Under a stated-income program or a no-ratio program, certain borrowers with acceptable payment histories will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken. Under a stated income/stated assets program, no verification of both a mortgagor's income and a mortgagor's assets is undertaken by the originator. Under a no-documentation program, no verification of a mortgagor's income or assets is undertaken by the originator and such information may not even be stated by the mortgagor. The loan purchasing decisions for such mortgage loans may be based primarily or entirely on an appraisal of the mortgaged property and the LTV ratio at origination.

***Omitted Information***: The alternative underwriting criteria used to make the underlying mortgage loans was not limited to borrowers with a demonstrated ability/willingness to pay, nor was it combined with more restrictive loan-to-value ratios. In fact, these "reduced documentation" programs were routinely extended to borrowers with poor credit histories, misstated income and misstated assets, and were used to issue loans which were not "verified," but rather apparent deficiencies were largely disregarded, with an emphasis on getting loans closed.

56. The Morgan Stanley Mortgage Loan Trust 2006-10SL Prospectus Supplement also stated:

> In addition, on a case-by-case basis, the Seller may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under its loan purchasing guidelines warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratios, low debt-to-income ratios, good credit history, stable employment, financial reserves, and time in residence at the applicant's current address. A significant number of the Mortgage Loans sold by the Seller to the Issuing Entity may represent underwriting exceptions.

***Omitted Information***: Exceptions to underwriting policies were not limited to situations involving consideration of "compensating factors," but rather loans outside the underwriting standards were made as a matter of course without consideration of mitigating factors.

57. Morgan Stanley Capital issued the following Registration Statement and/or Prospectuses between December 2005 and November 2007, which were false and misleading and were used to issue billions of dollars in Certificates:

| **REGISTRATION STATEMENT DATES** | **REGISTRATION NO.** | **TRUST** |
|---|---|---|
| DECEMBER 23, 2005 | 333-130684 | Morgan Stanley Mortgage Loan Trust 2006-5AR |
| FEBRUARY 17, 2006 (AMENDMENT) | | Morgan Stanley Mortgage Loan Trust 2006-4SL |
| MARCH 14, 2006 (AMENDMENT) | | Morgan Stanley Mortgage Loan Trust 2006-6AR |
| | | Morgan Stanley Mortgage Loan Trust 2006-7 |
| | | Morgan Stanley Mortgage Loan Trust 2006-8AR |
| | | Morgan Stanley Mortgage Loan Trust 2006-10SL |
| | | Morgan Stanley Mortgage Loan Trust 2006-9AR |
| | | Morgan Stanley Mortgage Loan Trust 2006-11 |
| | | Morgan Stanley Mortgage Loan Trust 2006-13ARX |
| | | Morgan Stanley Mortgage Loan Trust 2006-12XS |

| REGISTRATION STATEMENT DATES | REGISTRATION NO. | TRUST |
|---|---|---|
| | | Morgan Stanley Mortgage Loan Trust 2006-14SL |
| | | Morgan Stanley Mortgage Loan Trust 2006-15XS |
| | | Morgan Stanley Mortgage Loan Trust 2006-16AX |
| | | Morgan Stanley Mortgage Loan Trust 2006-17XS |
| | | Morgan Stanley Mortgage Loan Trust 2007-2AX |
| | | Morgan Stanley Mortgage Loan Trust 2007-1XS |
| | | Morgan Stanley Mortgage Loan Trust 2007-3XS |
| | | Morgan Stanley Mortgage Loan Trust 2007-5AX |
| | | Morgan Stanley Mortgage Loan Trust 2007-4SL |
| | | Morgan Stanley Mortgage Loan Trust 2007-6XS |
| | | Morgan Stanley Mortgage Loan Trust 2007-7AX |
| | | Morgan Stanley Mortgage Loan Trust 2007-8XS |
| | | Morgan Stanley Mortgage Loan Trust 2007-9SL |
| | | Morgan Stanley Mortgage Loan Trust 2007-11AR |
| | | Morgan Stanley Mortgage Loan Trust 2007-10XS |
| | | Morgan Stanley Mortgage Loan Trust 2007-12 |
| | | Morgan Stanley Mortgage Loan Trust 2007-13 |
| | | Morgan Stanley Mortgage Loan Trust 2007-14AR |
| | | Morgan Stanley Mortgage Loan Trust 2007-15AR |

**DISCLOSURES EMERGE ABOUT PROBLEMS WITH LOANS UNDERLYING THE CERTIFICATES**

58. The Certificates have recently been downgraded by the credit rating agencies. For example:

- The Morgan Stanley Mortgage Loan Trust 2007-5AX, Class 2A2, was downgraded by Moody's on February 4, 2007 to Caa1 (originally rated Aaa), and was downgraded by S&P on September 17, 2008 to BB (originally rated AAA).
- The Morgan Stanley Mortgage Loan Trust 2006-6AR, Class 1A2, was downgraded by Moody's on February 4, 2009 to Aa2 (originally rated Aaa).
- The Morgan Stanley Mortgage Loan Trust 2006-15XS, Class A2B, was downgraded by Moody's on February 4, 2009 to Baa1 (originally rated Aaa), and was downgraded by S&P on October 27, 2008 to AA (originally rated AAA).

59. The delinquency and foreclosure rates on the underlying mortgages have skyrocketed. The 60+ day delinquencies (including 60+, 30+ day delinquencies, foreclosures and real estate owned ("REO")) have increased to as high as 44% of the pools. Some of the pools have more than 18% in either foreclosure or REO.

**COUNT I**

**Violations of §11 of the 1933 Act Against All Defendants Except Morgan Stanley Capital**

60. Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

61. This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except Morgan Stanley Capital.

62. The Registration Statement for the Certificate offerings was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

63. The Defendant Issuers (the defendants listed in ¶15) are strictly liable to plaintiff and the Class for the misstatements and omissions.

64. MSMC was the underwriter for all of the issuances.

65. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

66. By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

67. Plaintiff acquired the Certificates pursuant and/or traceable to the Registration Statement and Prospectus Supplements.

68. Plaintiff and the Class have sustained damages. The value of the Certificates has declined substantially subsequent to and due to defendants' violations.

69. At the time of their purchases of the Certificates, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to mid-2008. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

## COUNT II

### For Violation of §12(a)(2) of the 1933 Act
### Against All Defendants

70. Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

71. By means of the defective Prospectus Supplements, defendants promoted and sold the Certificates to plaintiff and other members of the Class.

72. The defendant Rating Agencies' ratings of the Certificates was so important to investors in determining whether to purchase the Certificates as to make the Rating Agencies part of the sale of the Certificates.

73. The Prospectus Supplements contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed plaintiff and the other members of the Class who purchased the Certificates pursuant to the Prospectus Supplements the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus Supplements to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus Supplements as set forth above.

74. Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus Supplements at the time plaintiff acquired the Certificates.

75. By reason of the conduct alleged herein, defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased the Certificates pursuant to the Prospectus Supplements sustained substantial damages in connection with their purchases of the Certificates. Accordingly, plaintiff and the other members of the Class who hold the Certificates issued pursuant to the Prospectus Supplements have the right to rescind and recover the consideration paid for their shares, and hereby tender their Certificates to the defendants sued herein. Class members who have sold their Certificates seek damages to the extent permitted by law.

## COUNT III

### Violations of §15 of the 1933 Act
### Against the Individual Defendants, Morgan Stanley Capital and MS&Co

76. Plaintiff repeats and realleges each and every allegation contained above. For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

77. This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants, Morgan Stanley Capital and MS&Co.

78. Each of the Individual Defendants was a control person of Morgan Stanley Capital by virtue of his/her position as a director and/or senior officer of Morgan Stanley Capital. MS&Co controlled the Individual Defendants and its subsidiaries.

79. Each of the Individual Defendants was a culpable participant in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and/or serving as a director at the time the Registration Statement was

filed, and having otherwise participated in the process which allowed the offerings to be successfully completed.

80. Morgan Stanley Capital was the depositor for the offerings and was responsible for routing payments from the borrowers to investors.

81. Morgan Stanley Capital, MS&Co and the Individual Defendants prepared, reviewed and/or caused the Registration Statement and Prospectus Supplements to be filed and disseminated.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying plaintiff as Class representative;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: May 7, 2009

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

*/S/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

WEST VIRGINIA INVESTMENT MANAGEMENT BOARD ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*Sklar v. Bank of America Corporation, et al.*, No. 1:09-cv-00580-DC (S.D.N.Y.)

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28th day of April, 2009.

WEST VIRGINIA INVESTMENT MANAGEMENT BOARD

By: ______________________

Its: Executive Director

SCHEDULE A

SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type of Asset | Face Amount | Price |
|---|---|---|---|
| 06/20/2007 | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 5,430,000 | $101.00 |
| 12/11/2007 | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 935,938 | $96.08 |

Sales

| Date Sold | Type of Asset | Face Amount | Price |
|---|---|---|---|
| 07/01/2007 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 27,194 | $100.00 |
| 08/01/2007 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 79,443 | $100.00 |
| 09/01/2007 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 42,438 | $100.00 |
| 10/01/2007 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 31,555 | $100.00 |
| 11/01/2007 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 35,341 | $100.00 |
| 12/01/2007 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 28,172 | $100.00 |
| 01/01/2008 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 43,744 | $100.00 |
| 02/01/2008 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 19,678 | $100.00 |
| 03/01/2008 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 65,155 | $100.00 |
| 04/01/2008 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 62,919 | $100.00 |
| 05/01/2008 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 72,912 | $100.00 |
| 06/01/2008 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 62,699 | $100.00 |
| 07/01/2008 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 49,700 | $100.00 |
| 08/01/2008 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 16,454 | $100.00 |
| 09/01/2008 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 25,584 | $100.00 |
| 10/01/2008 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 49,991 | $100.00 |
| 11/01/2008 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 132,843 | $100.00 |

| | | | |
|---|---|---|---|
| 12/01/2008 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 53,823 | $100.00 |
| 01/01/2009 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 47,878 | $100.00 |
| 02/01/2009 * | Morgan Stanley Mortgage Loan Trust 2007-11AR 2A3, Mortgage Pass-Through Certificates | 4,934 | $100.00 |

* Mortgage paydown